Shaunttel C.L. DRAPER, Plaintiff Below, Appellant,

v.

The MEDICAL CENTER OF DELAWARE and Maternity & Gynecology Assoc., P.A., Defendants Below, Appellees.

No. 518, 1999.

Supreme Court of Delaware.

Submitted: Dec. 12, 2000.
Decided: March 12, 2001.

James F. Kipp, Esquire, and William L. Doerler, Esquire (argued), of Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, Delaware, for Appellant.

Richard Galperin, Esquire (argued), and Eileen K. Andersen, Esquire, of Morris, James, Hitchens & Williams, Wilmington, Delaware, for The Medical Center of Delaware, Inc.

David M. Lukoff, Esquire, of Elzufon & Austin, P.A., Wilmington, Delaware, for Maternity & Gynecology Associates, P.A.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

PER CURIAM.

In this appeal, we consider whether the Superior Court abused its discretion in dismissing a 1992 medical malpractice action for failure to prosecute. The trial court had dismissed this case in 1997, but this Court reversed in 1998 and remanded for further proceedings. After remand, the Superior Court did not enter a scheduling order or otherwise take steps to get this case back "on track," and appellant, who was then *pro se* and awaiting instructions from the court, did nothing. In 1999, when the prothonotary sent appellant a form warning that the case would be dismissed if no action were taken, appellant responded and her "reinstated" attorney advised the court that the case was ready for trial. Given these circumstances, and the concerns expressed in our 1997 decision on the same issue, we conclude that appellant should be given one more opportunity to have her day in court.

Factual and Procedural Background

In July 1990, Shaunttel C.L. Draper went to the emergency room at the Christiana Hospital complaining of abdominal pain and heavy vaginal bleeding. Two resident doctors performed certain diagnostic procedures, including a laparoscopy, and Draper was released the following day. Draper returned to the emergency room three days and, again, five days after her initial visit, complaining of increasing abdominal pain. Six days after the first laparoscopy, a different doctor performed an exploratory laparoscopy and small bowel resection. The new doctor discovered a perforation in Draper's small bowel that allegedly resulted from the first laparoscopy. Draper required additional surgery and was hospitalized for two weeks.

In February 1992, Draper's attorney, James F. Kipp, Esquire, filed suit on her behalf against The Medical Center of Delaware, Inc. and Maternity & Gynecology Associates, P.A. The complaint alleges that appellees were negligent in that they: (i) performed the initial laparoscopy without exercising sufficient care to avoid perforating the bowel; (ii) failed to check for a perforated bowel after performing the laparoscopy; (iii) failed to note the possibility of a perforation on Draper's medical charts; (iv) failed to advise Draper of the possibility of a perforated bowel and consequent infection; and (v) failed to promptly identify and treat the infection that resulted from the perforation. The complaint seeks an unspecified amount of damages for medical expenses, pain and suffering, lost wages and earning capacity, and allegedly permanent injuries to Draper's reproductive organs, bowel function, abdominal soft tissue and heart muscles.

For the first few years after suit was filed, it appears that the litigation was proceeding in the normal course. The docket sheet indicates that both sides took discovery, Draper requested a five day jury trial, and a "firm trial date" was set for August 1995. Shortly before the scheduled trial date, the parties stipulated to a continuance and, shortly after that, Kipp moved to withdraw as counsel.

Draper continued to litigate her claim *pro se* after October 1995, when Kipp withdrew. She filed several motions for summary judgment; the parties attempted mediation; and the court set new dates from November 1996 through April 1997 for discovery cut-off, filing of dispositive motions, pre-trial conference and trial. After Draper failed to appear at the pre-trial conference, the Superior Court grant-

ed appellees' motion to dismiss in March 1997.

This Court reversed that dismissal by Order dated March 16, 1998. In its Order, the Court wrote:

4. At the March 31, 1997 hearing on the motion to dismiss, Mr. Kipp appeared in court without entering his appearance and represented that if the Court did not dismiss the action he would re-enter his appearance for Draper. His offer to again represent Draper was based on his concern that she had not, and could not, obtain other counsel.

\* \* \*

5. Mr. Kipp also alluded to a psychiatric exam of Draper that counsel for the Medical Center conceded had occurred.... The counsel for the Medical Center did advise the Court that Draper "has psychological problems that need to be dealt with formally...." No representation or inquiry was made as to whether Draper had the capacity to represent herself.

\* \* \*

8. In this case, the illogical text of the *pro se* filings by Draper, the unrealistic demands she made on Mr. Kipp, the existence of a mental examination that was never submitted to the Court, and Mr. Kipp's willingness to step forward and again represent Draper, all mandated against the dismissal, especially in view of the Delaware public policy favoring giving a litigant her day in court.

After the case was remanded to the Superior Court in March 1998, the docket sheet reflects no activity until April 29, 1999. On that date, the prothonotary sent out a Rule 41(e) form notifying the parties that there had been no activity during the past six months and that, "[i]f no proceed-ings are taken within the next thirty (30) days, this action will be dismissed by the Court for want of prosecution." Draper filed a timely response stating that "counsel responsibilities" were to be assumed by Kipp and that Draper was "currently awaiting instruction from the Court."

The trial court then requested a status report from Kipp, who filed a re-entry of appearance on June 16, 1999, and suggested that the court hold a conference to set a new trial date. The court scheduled a status conference, but before the conference was held, appellees filed their second motion to dismiss for failure to prosecute. The trial court granted the motion and denied Draper's motion for reargument. This appeal followed.

### Discussion

It is settled law that the trial court has discretion to dismiss an action for failure to prosecute.[1] This authority stems from the court's inherent power to "manage its own affairs and to achieve the orderly and expeditious disposition of its business."[2] But the important goal of timely adjudications must be balanced against the strong policy in favor of decisions on the merits.[3] The problems arising from a *pro se* litigant's lack of familiarity with the law and court procedures also must be considered. Where, as here, a plaintiff has almost completed trial preparation and the litigation stalls because of the departure of counsel, the trial court should make some effort to get the case back on track before dismissing for failure to prosecute. By 1997, if not before, the trial court knew that this case presented serious case management problems. Following Kipp's departure, Draper pursued meritless motions for summary judgment and corresponded with both the assigned trial judge and the President Judge about

1. *Ayers v. D.F. Quillen & Sons, Inc.,* Del. Supr., 188 A.2d 510 (1963), Super Ct. Civ. R. 41.

2. *Gebhart v. Ernest DiSabatino & Sons, Inc.,* Del.Supr., 264 A.2d 157, 159 (1970).

3. *Battaglia v. Wilmington Sav. Fund Soc.,* Del. Supr., 379 A.2d 1132, 1135 (1977).

her medical needs and a purported oral settlement agreement. As this Court noted in its first decision, Draper's submissions were "illogical." In ruling on the first motion to dismiss, the trial court noted that it had made significant efforts to shepherd this case. The court expressed doubt that Draper ever could ready the case for trial, and it was unwilling to rely on Kipp's offer to resume representation as a means of avoiding future delays.

The extra level of judicial attention that the trial court recognized was necessary for this case before it was dismissed should have continued after this Court reversed the dismissal. A simple letter to all parties, or a status conference, presumably would have been enough to prompt Kipp's re-entry of appearance following the remand. With Draper again represented by counsel, the trial court could have set a firm pre-trial and trial schedule together with whatever type of "zero tolerance" provisions that the court deemed appropriate. Instead, this case remained dormant until the prothonotary's form Rule 41(e) letter went out one year after the remand.

We do not mean to suggest that the trial court, alone, was responsible for moving this case forward after the remand. We are troubled by Kipp's failure to promptly reenter his appearance after assuring both the trial court and this Court of his intention to do so. His explanation—that he was waiting for the trial court to enter a new scheduling order—does not offer a complete answer since, as he acknowledged, he could have requested a scheduling conference at any time. Indeed, under other circumstances, an effort by counsel to shift responsibility for the failure to prosecute a case from himself to the court would be unavailing. It is only because Draper was still formally unrepresented at the time of the remand that we focus on the need for intervention by the trial court.

■ It is important that this decision not be misconstrued. Litigants, whether represented by counsel or appearing *pro se*, must diligently prepare their cases for trial or risk dismissal for failure to prosecute. There is no different set of rules for *pro se* plaintiffs, and the trial court should not sacrifice the orderly and efficient administration of justice to accommodate an unrepresented plaintiff. It is only in cases such as this, where it was reasonable for the *pro se* litigant to have been waiting for the trial court to take action following a remand, that we find dismissal for failure to prosecute inappropriate.

### Conclusion

Based on the foregoing, the decision of the Superior Court is REVERSED and this matter is REMANDED for further action by the Superior Court in accordance with this opinion.