# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

LAURIE ANN DENHAM,     )
    )
    Appellant,     )
    )
    v.     )     C.A. No. N17A-02-009 FWW
    )
    )
DELAWARE BOARD OF MENTAL     )
HEALTH AND CHEMICAL     )
DEPENDENCY PROFESSIONALS,     )
    )
    Appellee.     )

Submitted: August 4, 2017
Decided: November 30, 2017

On Appeal of the Delaware Board of Mental Health and Chemical Dependency
Professionals,
**AFFIRMED.**

## OPINION AND ORDER

Gary W. Alderson, Esquire, Elzufon Austin & Mondell, P.A., 300 Delaware
Avenue, 17th Floor, P.O. Box 1630, Wilmington, Delaware 19899; Attorney for
Appellant, Laurie Ann Denham.

Zoe Plerhoples, Esquire, Deputy Attorney General, State of Delaware Department
of Justice, 820 N. French Street, Wilmington, Delaware 19801; Attorney for
Appellee, Delaware Board of Mental Health and Chemical Dependency
Professionals.

**WHARTON, J.**

# I. INTRODUCTION

Appellant Laurie Ann Denham ("Denham") filed a Notice of Appeal on February 10, 2017, requesting judicial review of the January 12, 2017 order by the Delaware Board of Mental Health and Chemical Dependency Professionals ("Board"). Denham contends that the Board erred in revoking her professional mental health counselor license.

In considering this appeal, the Court must determine whether the Board's decision to revoke Denham's professional mental health counselor license is supported by substantial evidence and free of legal error. Upon consideration of the pleadings before the Court and the record below, the Court finds that there is substantial evidence to support the Board's ruling, and the Board did not err in reaching its decision. Accordingly, the Board's decision is **AFFIRMED**.

# II. FACTUAL AND PROCEDURAL CONTEXT

Denham is a Delaware-licensed professional counselor of mental health ("LPCMH").[1] Between November 2013 and July 2015 Denham provided mental health services to a client, A.I., at Pike Creek Psychological Center, and then at her own practice, Touching Hearts Psychological Center.[2] A Hearing Officer found Denham violated the National Board for Certified Counselors' Code of Ethics ("the

---

[1] *See* Final Board Order at 1.
[2] *See* State's Compl. at 1.

2

Ethics Code") in providing such services. Denham appeals that finding. Denham was previously disciplined by the Board in January 2016 for ethics violations, including a breach of confidentiality.[3]

In 2013, client A.I. was referred to Denham to assess and treat A.I.'s PTSD and anxiety. In 2014, while treating A.I., Denham began to socialize regularly with A.I. outside of therapy. In April 2014, Denham contacted A.I. for reasons unrelated to therapy and asked A.I. to pray for her friend.[4] The next night, at A.I.'s suggestion, the two went out for drinks.[5] The two often went out for dinner, drinks, and therapy sessions.[6] During these dinner sessions, the two would have regular conversations; yet, Denham was paid for her professional services.[7]

Over the next several months, Denham frequently emailed, Facebook messaged, and text messaged A.I. outside of therapy.[8] However, between May 2014 and August 2014, Denham did not document any of A.I.'s weekly therapy sessions in her records. Over the entire course of treatment with A.I., Denham did not document their social communications, including their outside meetings, their text and email messages, or social media contacts.

---

[3] *See* Recommendation of Hearing Officer at 52,59.
[4] *Id.* at 53.
[5] *Id.* at 53-57.
[6] *Id.* 53-54.
[7] *Id.*
[8] *Id.* at 55.

In July 2014, Denham asked A.I. to follow and take pictures of the estranged wife of Denham's boyfriend.[9] In August of 2014, Denham scheduled a sensory therapy session with A.I. to occur on the beach.[10] Denham advised A.I. that they would meet at 5:45; work on sensory therapy until 7:30; and "end with 'mind cool down' with a glass of wine as [they] watch the sun set."[11] Denham asked A.I. to bring the wine, and they consumed the entire bottle.[12] The two often drank alcohol during therapy sessions.[13] Between May 2014 and August 2014, Denham did not document any of A.I.'s weekly therapy sessions in her records.[14] Over the entire course of treatment with A.I., Denham did not document their social communications, including their outside meetings, their text and email messages, or social media contacts.[15]

In January of 2015, Denham started a charity and asked A.I. to join to utilize her photographic talents.[16] A.I. agreed, took photos at events, and served as the

---

[9] *See* Final Board Order at 2.

[10] Tr. of Administrative Hearing before Division of Professional Regulation Hearing Officer at 47-48.

[11] *See* Final Board Order at 2.

[12] Tr. at 48.

[13] *Id.* at 49.

[14] *See* Recommendation of Hearing Officer at 57. The Hearing Officer also noted a gap in the treatment records between August of 2014 and February of 2015. A.I. stated that "after [she] left Pike Creek, [Denham] took minimal notes on A.I. at Wellbeing" during treatment sessions. Tr. at 88.

[15] *Id.* at 77. Denham admitted that she erased Facebook and text messages in order to "hide the dual relationship." Tr. at 407.

[16] *Id.* at 58-60.

4

administrator of the charity's Facebook page. However, A.I. was not compensated for her work.[17] In addition, at Denham's request, A.I. photographed the wedding of Denham's son and a family photo shoot for Denham's sister-in-law.[18] In April of 2015, A.I. and her husband helped Denham move, and stored some of Denham's furniture in their basement.[19] In May of 2015, A.I. penned a multitude of intimate writings for Denham including a poem and Denham's proposed eulogy.[20] On July 9, 2015, Denham and A.I. met at a restaurant to discuss boundary issues.[21] Denham informed A.I. that she could not maintain the therapeutic relationship in light of Denham's inability to remain objective.[22] A.I. begged Denham not to abandon her, but when A.I. became upset Denham walked out of the restaurant, leaving her.[23] The next day, Denham texted A.I., recommending A.I. find a new therapist, but did not make a referral.[24]

Following the abrupt termination of the client-therapist relationship, A.I. sought emergency treatment with her psychiatrist, Karen McCormick, followed by a new therapist, Colleen McGinnis.[25] Both McCormick and McGinnis filed

---

[17] *Id.* at 58-59.
[18] *Id.* at 59.
[19] *Id.* at 60.
[20] *Id.*
[21] *Id.* at 61-62.
[22] *Id.*
[23] *Id.*
[24] Tr. at 325-326.
[25] *Id.*

professional complaints against Denham with the Division of Professional Regulation ("DPR").[26] In response, Denham asked A.I. to write a letter to McCormick and McGinnis retracting what she said about Denham.[27] In September of 2015, Denham sent A.I. a Facebook message stating that Denham could only save her license and livelihood if A.I. retracted her statements.[28] A.I. declined, and on September 18, 2015, Denham met A.I. outside of A.I.'s school and threatened to tell people that A.I. was "'crazy' and needed to go to the 'crazy house' and that she would lose her children."[29]

In October of 2015, Denham formally responded to the DPR complaint in writing, stating, "Other than the continuity of care and/or clinical treatment, A.I. and I have not been in a social environment as a result of friendship or any other relationship other than a therapeutic relationship."[30] Yet, soon thereafter, Denham and A.I. made plans to see a favorite band together at a bar.[31] At the bar a third party took a photo of the two hugging, tagged them in the photo, and posted it on Facebook.[32] Dawn Schatz ("Schatz"), Denham's landlord and a licensed mental

---

[26] *Id.*

[27] *See* Final Board order at 2-3.

[28] *Id.* at 3.

[29] *See* Recommendation of Hearing Officer at 2-3.

[30] State's Hrg. Ex. 7 at 1. Denham, however, admitted at the hearing that this was a lie. Tr. at 399-400.

[31] *See* Recommendation of Hearing Officer at 65.

[32] Tr. at 197; *see also* Recommendation of Hearing Officer at 65-66; State's Hrg. Ex. 12 at 1-3.

6

health professional, saw the picture and recognized A.I. as Denham's client.[33] Schatz took a screen-shot of the photo and submitted it to DPR with a complaint regarding Denham's lack of professional boundaries.[34]

In response to the Schatz complaint Denham told the DPR investigator that she and A.I. had gone to the bar separately.[35] Denham knew that this was a lie, however.[36] Denham then repeatedly asked A.I to lie to the DPR investigator about their evening out at the bar.[37] A.I. refused and the two exchanged hostile Facebook messages, culminating in A.I. accusing Denham of blackmailing her.[38] Later, A.I. asked Denham to retrieve her furniture from A.I.'s home. Denham responded by accusing A.I. of being "beyond the cruelest person I know," "unstable," "a ticking time bomb," and of having a "fatal attraction" to Denham.[39] Furthermore, Denham claimed she was going to call A.I.'s principal and a crisis hotline.[40] In December of 2015, Denham sent A.I. a Facebook message with a song she wrote for A.I., but accusing A.I. of wanting to see her "hang" and purposely "throwing her under the

---

[33] Tr. at 197-199.
[34] *Id.* at 197; *see also* Recommendation of Hearing Officer at 65-66; State's Hrg. Ex. 12 at 1-3.
[35] *See* Recommendation of Haring Officer at 65.
[36] *Id.*
[37] *Id.* at65-67.
[38] *Id.* at 68 (A.I. accused Denham of blackmail "because she was going to tell the Board that A.I. was crazy and talks to God.").
[39] *Id.* at 68.
[40] *Id.*

7

bus."[41] Denham's on-again-off-again relationship with A.I. left A.I. ashamed, fearful, embarrassed, deceived, threatened, and "gone."[42]

In December 2015, the State filed a formal Complaint with the Board against Denham alleging multiple violations of the Ethics Code.[43] A Hearing Officer conducted a hearing on the State's Complaint on June 8, 2016 and August 8, 2016.[44] The Hearing Officer determined that Denham violated Ethics Code directives 5, 6, 19-21, 44, 54, 61, 66 and 76,[45] which pursuant to Board Regulation 2.5, constitutes

---

[41] *Id.*

[42] *Id.* at 70.

[43] State's Ex. 1 at 1-4.

[44] *See* Final Board Order at 1.

[45] *See* State's Hrg. Ex. 2 at 1-9. The Ethics Code Directives cited are:
Directive #5: Counselors shall not engage in harmful multiple relationships with client. If a harmful multiple relationship develops in unforeseen manner, counselor shall discuss potential effects with client and shall take reasonable steps to resolve the situation, including the provision of referrals. This discussion is documented in client's record.
Directive #6: Counselors shall discuss "important considerations" to avoid exploitation before entering into non-counseling relationship with former client. "Important considerations" include amount of time since counseling termination, duration of counseling, nature and circumstances of counseling, likelihood that client will want to resume counseling in the future; and circumstances of termination and possible negative effects or outcomes.
Directive #19: Counselors shall recognize the potential harm of informal uses of social media and other related technology with clients, former clients, and their families and friends. After carefully considering all of the ethical implications, including confidentiality, privacy and multiple relationships, counselors shall develop written practice procedures in regard to social media and digital technology, and these shall be incorporated with the information provided to clients before or during initial session. At a minimum, these social media procedures shall specify that personal accounts will be separate and isolated from any used for professional counseling purposes, including those used with

a violation of 24 Del. C. § 3009(a)(5).[46] In particular, the Hearing Officer found that

Denham engaged in a harmful dual relationship with her client, did almost nothing

---

prospective or current clients. These procedures shall also address "friending" and responding to material posted.

Directive #20: Counselors shall not use social media sources (e.g. updates, tweets, blogs, etc.) to provide confidential information regarding client cases that have not been consented to by client. To facilitate secure provision of information, counselors shall inform clients prior to or during initial session about appropriate ways to communicate with them. Furthermore, counselors shall advise clients about potential risks of sending messages through digital technology and social media sources.

Directive #21: Counselors who use digital technology (e.g. social media) for professional purposes shall limit information posted to that which does not create multiple relationships or which may threaten client confidentiality.

Directive #44: Counselors shall accurately note in client's records all information necessary for provision of quality services or as required by laws, regulations or institutional procedures.

Directive #54: Counselors shall include all electronic communications exchanged with clients including those through digital technology and social media as part of the record, even when strictly related to clerical issues such as change of contact info or scheduling. All electronic therapeutic communications methods shall use encryption and password security.

Directive #61: Counselors shall not misuse their professional influence or meet their own needs at the expense of clients or their welfare. This shall include the promotion of products developed by the counselor.

Directive #66: Counselors shall limit use of information obtained through digital technology and social media sources (e.g. Facebook, LinkedIn, Twitter, etc.) in accordance with established practice procedures provided to clients at the initiation of services.

Directive #76: Counselors shall discuss service termination with clients when there is a reasonable belief that the clients are no longer benefiting from or unlikely to benefit from future services. Counselors shall not abruptly terminate counseling services without good cause or significant justification, and in such cases, and counselors shall provide appropriate referrals.

[46] Section 3009(a)(5) states that "[a] person licensed under this chapter is subject to the disciplinary sanctions set forth in § 3011 of this title if, after a hearing, the

9

to resolve the "harmful multiple relationship" she created, and then "threatened to use personal and confidential information gained through therapy…to blackmail A.I. in order to save herself."[47] The Hearing Officer also found that Denham "exploited [A.I.] through scare tactics" during the DPR investigation;[48] did not document the use of social media with A.I.; had no policies regarding social media; did not consider the ethical implications of using social media to communicate with A.I.;[49] and did not accurately maintain A.I.'s treatment records.[50] The Hearing Officer further concluded that the record [was] replete with evidence of [Denham] misusing her professional influence to meet her own needs at A.I.'s expense and welfare.

As a result of the violations, the Hearing Officer recommended suspending Denham's license for three years with the suspension stayed after six months for three years' probation conditioned on Denham: (1) entering the Delaware Professionals' Health Monitoring Program; (2) obtaining an LPCMH to act as her supervisor; (3) creating and adhering to a professional development plan; (4) completing continuing education credits in ethics, the use of social media, and boundaries; and (5) paying a $1,000.00 fine.[51]

---

Board finds that the licensee has: Violated a provision of this chapter or a regulation promulgated by the Board under this chapter."
[47] *See* Recommendation of Hearing Officer at 70-73.
[48] *Id.* at 74.
[49] *Id.* at 74-76.
[50] *Id.* at 77.
[51] *Id.* at 83-84.

10

The parties were given twenty days from the date of the Hearing Officer's proposed order to submit written exceptions, comments, and arguments concerning the conclusions of law and recommended penalty.[52] Denham did not submit anything.[53] The State, however, submitted written exceptions and attended the Board's meeting to argue for more significant discipline than the Hearing Officer's recommendation.[54] In particular, the State argued that Denham exploited, manipulated, and used a vulnerable client, attempted to place blame for her own misconduct on that client, and lied to DPR investigators during the course of the investigation.[55]

After deliberating, the Board voted to affirm the Hearing Officer's recommended conclusions of law, but amended the recommended discipline.[56] Based upon Denham's pattern of unethical behavior, failure to submit required reports, and overwhelming egregious conduct the Board determined the recommended discipline was too light and unanimously voted to revoke Denham's license.[57]

## III. THE PARTIES CONTENTIONS

---

[52] *Id.* at 84.
[53] Final Board Order at 4-5.
[54] *Id.* at 5.
[55] *Id.*
[56] *Id.*
[57] *Id.*

Denham contends that she was not afforded due process because she was denied a meaningful hearing.[58] In particular, Denham argues that the Hearing Officer committed legal error when she (1) declined to rule on Denham's objection to the State's proffer of Dawn Schatz as an expert;[59] (2) permitted Schatz to offer expert opinion testimony,[60] (3) considered Denham's past discipline as an aggravating factor;[61] and (4) failed to afford Denham proper deference as a *pro se* litigant.[62]

In response, the Board argues that Denham had the opportunity to be heard and to present testimony during the hearing and therefore was afforded due process.[63] In particular, the Board argues that Schatz was properly allowed to give limited testimony as a mixed fact/expert witness regarding the basis for her professional complaint;[64] Denham was afforded significant deference as a *pro se* litigant;[65] the Board properly considered Denham's prior discipline as an aggravating factor;[66] the Board did not require expert testimony to find violations of

[58] Appellant's Opening Br., D.I. 11 at 11.
[59] *Id.* at 13.
[60] *Id.* at 13-15.
[61] *Id.* at 21-22.
[62] *Id.* at 22-23.
[63] Appellee's Answering Br., D.I. 13, at 14-15.
[64] *Id.* at 15-19.
[65] *Id.* at 20-22.
[66] *Id.* at 22-25.

the ethics code directives;[67] and there is substantial evidence to support the Board's finding that Denham violated the ethics code directives.[68]

## IV. STANDARD OF REVIEW

The Administrative Procedures Act ("APA") vests this Court with jurisdiction over appeals from a final order of the Board.[69] The Board's final order must be affirmed so long as it is supported by substantial evidence and free from legal error.[70] Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.[71] While a preponderance of evidence is not necessary, substantial evidence means "more than a mere scintilla."[72] The Court takes due account of the Board's specialized competence and the purpose of the law under which the Board acted,[73] and does not weigh the evidence, determine credibility or draw its own factual findings or conclusions.[74]

---

[67] *Id.* at 25-29.

[68] *Id.* at 29-37.

[69] See 29 *Del. C.* §§ 10142, 10102(4).

[70] *Conagra/Pilgrim's Pride, Inc. v. Green*, 2008 WL 2429113, at *2 (Del. June 17, 2008); *Jordan v. Bd. of Pension Trs. of Del.*, 2004 WL 2240598, *2 (Del. Super. Sept. 21, 2004); *King v. Bd. of Pension Trs. of Del.*, 1997 WL 718682, at *3–*4 (Del. Super. Aug. 29, 1997).

[71] *Lehto v. Bd. Of Educ. of Caesar Rodney Sch. Dist.*, 962 A.2d 222, 225-226 (Del. 2008).

[72] *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988); *see also Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981).

[73] 29 *Del. C.* §10142(d).

[74] *Janaman v. New Castle Cnty. Bd. Of Adjustment*, 364 A.2d 1241, 1242 (Del. Super. Ct. Aug. 19, 1976).

Questions of law are reviewed *de novo*.[75] If the Board's findings and conclusions are sufficiently "supported by the record and are the product of an orderly and logical deductive process," its decision will be affirmed.[76]

## V. DISCUSSION

### A. The Board's Decision is Supported by Substantial Evidence Because a Reasonable Mind Might Accept That Denham Violated the Ethics Code Directives.

The Board relied upon the following facts to reach the decision to revoke Denham's license: Denham engaged in a harmful dual relationship with her client; Denham did nothing to address the "harmful multiple relationship" she created; Denham "threatened to use personal and confidential information gained through therapy…to blackmail A.I. in order to save herself;"[77] Denham "exploited [A.I.] through scare tactics" during the DPR investigation;[78] Denham did not document the use of social media with A.I.; Denham had no policies regarding social media; Denham did not consider the ethical implications of using social media to communicate with A.I.;[79] Denham did not accurately maintain A.I.'s treatment records;[80] and [Denham] misused her professional influence to meet her own needs

---

[75] *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998); *see also Ward v. Dep't of Elections*, 2009 WL 2244413, at *1 (Del. Super. July 27, 2009).
[76] *Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959, 963 (Del. 2003).
[77] *See* Recommendation of Hearing Officer at 70-73.
[78] *Id.* at 74.
[79] *Id.* at 74-76.
[80] *Id.* at 76.

at A.I.'s expense and welfare. Additionally, based upon Denham's pattern of unethical behavior, failure to submit required reports, and overwhelming egregious conduct the Board determined the Hearing Officer's recommended discipline was insufficient and unanimously voted to revoke Denham's license.[81] Based on those facts, the Court finds that there is substantial, if not overwhelming, evidence to conclude that Denham violated the Ethics Code Directives and that license revocation was appropriate.

## B. The Hearing Officer Committed No Legal Error in Reaching Her Decision.

Denham asserts that the Hearing Officer committed legal error when she (1) permitted Schatz to offer expert opinion testimony;[82] (2) declined to rule on Denham's objection to the State's proffer of Dawn Schatz as an expert;[83] (3) considered Denham's past discipline as an aggravating factor;[84] and (4) failed to afford Denham proper deference as a *pro se* litigant.[85]

### 1. The Board Did Not Require Expert Testimony to Find Violations of the Ethics Code Directives, and, Furthermore, the Hearing Officer Properly Allowed Schatz to Give Testimony as a Mixed Fact/Expert Witness.

---

[81] *See* Final Board Order at 5.
[82] *See* Recommendation of Hearing Officer at 7-9.
[83] *Id.* at 7.
[84] *Id.* at 15-16.
[85] *Id.* at 16-17.

15

A Board's review of licensing issues may rely on expert testimony, however, not all Board decisions require expert testimony in order to establish the standard of care.[86] A Board may use its institutional experience or administrative expertise to evaluate evidence,[87] including a determination as to whether a licensee's conduct violates its laws.[88] Accordingly, the State was not obligated to present expert testimony to establish Denham's violations of the Ethics Code, nor did the Board's finding of violations of the Ethics Code Directives require expert testimony. Rather, the Board correctly drew upon its institutional expertise, to the extent any expertise was even necessary, to accept the conclusions of law and substantiate the violations.[89] Therefore, the Board did not commit legal error when it found Denham violated the Ethics Code Directives without the use of expert testimony.

The Court also finds that the Hearing Officer did not commit legal error when she allowed Dawn Schatz to give limited testimony as a mixed fact/expert witness. Pursuant to the APA and 24. *Del.C.* § 3012(b) administrative hearings are

[86] *Bilski v. Bd. Of Med. Licensure and Discipline of Delaware*, 2014 WL 3032703 (Del. Super. Ct. June 30, 2014), reargument denied, 2014 WL 5282115 (Del. Super. Oct. 16, 2014), aff'd, 115 A.3d 1214 (Table) (Del. 2015).
[87] *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981) (citation omitted).
[88] *See e.g., Jain v. Del. Bd. Of Nursing*, 2013 WL 3389287 (Del. Super. Ct. Feb 13, 2013), aff'd, 72 A.3d 501 (Table) (Del. 2013); *Frazer v. Del. Bd. Of Nursing*, 2016 WL 6610320, at *3-4 (Del. Super. Ct. Nov. 9, 2016).
[89] It strikes the Court that little expertise was necessary to apply the facts as the Hearing Officer found them to the plain language of the Ethics Code.

to be conducted informally, and without the use of rules of evidence.[90] Schatz was proffered as a mixed fact/expert witness and offered opinion testimony based on her professional background. Schatz' opinion, however, was limited to her explanation as to why she filed a complaint with DPR; did not address specific violations of the Ethics Code; and played no role in the Hearing Officer's conclusions of law. Therefore, because of the limited nature of Schatz' expert testimony, it was not legal error for the Hearing Officer to allow Schatz to be proffered as a mixed fact/expert witness. The Court also does not find that the Hearing Officer committed legal error when she reserved ruling on Schatz' status as an expert witness. Denham neither cites, nor provides evidence to support this proposition and the Court finds no such evidence.

## 2. The Board Did Not Commit Legal Error When It Considered Denham's Past Discipline as an Aggravating Factor.

The Board may impose a range of sanctions where it finds that a licensee has engaged in a condition or violation that constitutes grounds for discipline.[91] The record must clearly show the basis on which the administrative agency did act in order that its exercise of discretion may be properly reviewed.[92] Denham argues

---

[90] Pursuant to 29 *Del. C.* § 10161(a)(26), the Board is governed by the procedures of the APA; per 19 *Del. C.* § 10161(e), "[a]ll hearings shall be informal without use of rules of evidence."

[91] 24 *Del. C.* § 3011.

[92] *Spear v. Blackwell & Son, Inc.*, 221 A.2d 52, 55 (Del. Super. Ct. June 21, 1966).

17

that prior disciplinary action was not addressed in the Complaint or submitted into evidence at the hearing, therefore it was legal error for the Board to consider it. However, there is no requirement that the record be comprised solely of facts referenced in the Complaint or presented at a hearing.[93] Therefore the Board acted properly and did not commit legal error when it considered Denham's prior discipline as an aggravating factor.

### 3. Denham Was Afforded Proper Deference as a *Pro Se* Litigant and Due Process Under the APA and Board's Statutes.

Courts will give *pro se* litigants "some degree of latitude in preparing and presenting their cases."[94] However, *pro se* litigants are not held to a different set of procedural rules than other parties.[95] Denham argues that she was held to a higher standard than routinely applied to *pro se* litigants, but provides no evidence to support that contention. Rather, the record reflects that she was allowed leeway in her testimony and questions to State's witnesses,[96] the Hearing Officer explained the procedures of the hearing to her,[97] and the Hearing Officer attempted to ensure

---

[93] 29 *Del. C.* § 10127: "With respect to each case, all notices, correspondence between the agency and the parties, all exhibits, documents and testimony admitted into evidence and all recommended orders, summaries of evidence and findings and all interlocutory and final orders of the agency shall be included in the agency's record of the case and shall be retained by the agency." See also Wilson v. Elliott, 1985 WL 21123, at *2 (Del. Chan. May 22, 1985).

[94] *Buck v. Cassidy Painting, Inc.*, 2011 WL 1226403, at 2* (Del. Super. 2011).

[95] *Draper v. Med. Ctr. Of State*, 767 A.2d 796, 799 (Del. 2001).

[96] Tr. at 111, 114, 116, 121, 128-133, 140, 146, 150-151, 376.

[97] Id. at 4, 43-44.

18

that her exhibits were presented in full to establish a clear record.[98] Therefore, the Court finds that Denham was afforded proper deference as a *pro se* litigant and no legal error occurred.

Denham's claim that her due process rights were violated because the State did not provide her with its evidence and exhibits before the hearing is also unavailing. The APA does not provide a licensee facing discipline the absolute right to discovery or to depositions.[99] To establish a due process violation, Denham must demonstrate that (1) she was not adequately informed of the charges against her, and (2) the lack of that information prejudiced her ability to defend against the charges.[100] Denham, however, fails to cite to the record or to any authority which would establish a due process violation. Moreover, the record demonstrates that Denham was clearly informed of the nature of the charges against her. The Court finds the Denham was afforded due process under the APA and the relevant Board rule and statues. No legal error occurred.

## VI. CONCLUSION

---

[98] *Id.* at 109-111, 123, 149-150, 152; *see also* Recommendation of Hearing officer at 37.

[99] *Rooney v. Del. Bd. Of Chiropractic*, 2011 WL 2088111, at 4* (Del. Super. Ct. Apr. 27, 2011) (citing *Kotler v. Bd. of Med. Practice*, 1883 WL 54587, at *4 (Del. Super. Ct. Jan. 19, 1993)).

[100] *Id.* at 5.

The Court finds that the Board's decision was supported by substantial evidence, was the product of an orderly and logical deductive process, and was free from legal error. Therefore, the decision of the Board is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

Ferris W. Wharton, Judge

20

The Court finds that the Board's decision was supported by substantial evidence, was the product of an orderly and logical deductive process, and was free from legal error. Therefore, the decision of the Board is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

_____
Ferris W. Wharton, Judge