# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KENNETH TALLEY and JANICE TALLEY, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | C.A. No. 2021-0011-PWG |
| JUDITH TALLEY HORN and DARREN HORN, | ) ) ) | |
| Defendants. | ) ) | |

## MASTER'S REPORT

Date Submitted:  June 10, 2022
Final Report:    October 4, 2022

Plaintiff Kenneth Talley, Milton, Delaware, *Pro se*, and Plaintiff Janice Talley, Dover, Delaware, *Pro se*

David J. Weidman, Esquire, SERGOVIC CARMEAN WEIDMAN MCCARTNEY & OWENS PA, Georgetown, Delaware, *Attorney for Defendants Judith Talley Horn and Darren Horn*

**GRIFFIN, M.**

Pending before me is a matter in which a father and mother claim an equitable life estate interest in real property owned by their daughter and son-in-law through promissory or equitable estoppel, or a constructive trust. At trial, petitioners also claimed that they had a contractual agreement with their daughter and son-in-law to purchase the property and seek specific performance of that agreement. The daughter and son-in-law purchased the property in 1989 to offer the parents and younger siblings a place to live and the parents lived in the property for many years. After trial, I recommend that the Court deny petitioners' claims and enter judgment in the daughter and son-in-law's favor, declaring that petitioners have no interest in the property, entering an order cancelling the lis pendens on the Property consistent with 25 *Del. C.* §1606, and declining to shift fees in this case. This is a final report.

## I.    BACKGROUND[1]

### A.  Factual Background

Darren Horn ("Darren") and Judith Horn ("Judith," together "the Horns") purchased property located at 28289 Broadkill Road, Milton, Delaware on November 22, 1989 ("Property"), intending to provide Kenneth Talley ("Kenneth") and Janice Talley ("Janice," together "the Talleys"), who are Judith Horn's parents,

---

[1] I appreciate that a lot of family history was presented in this case but those matters are not relevant to my decisions in this case and I do not address or make findings of fact related to those matters. I refer to the trial transcript as "Trial Tr.," the Horns' trial exhibits as "Defs.' Tr. Ex." and the Talleys' trial exhibits as "Pls.' Tr. Ex."

and Judith's younger siblings, Kevin Talley ("Kevin") and Kristina Talley ("Kristina"), with a place to live.[2] Judith testified that, in 1989, her parents had "nowhere to go" and, fearing they would be "homeless," she persuaded Darren to purchase the Property for her parents to live in.[3] Darren testified that they purchased the property with the intention that the Talleys "would one day buy the property" from the Horns "for fair market value," and that he discussed that intention with Kenneth and Janice after settlement in 1989.[4] Both Judith and Darren testified that they never promised the Talleys a life estate or that they could live on the Property for the rest of their lives.[5] Kenneth testified that the only understanding he had with

---

[2] Trial Tr. 109:15-17; *id.* 203:7-18; *see* Pls.' Tr. Ex. 1; Sussex County Recorder of Deeds. Deed Book 1685, Page 327. The Court may take judicial notice of records in the Recorder of Deeds. *See generally, Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC,* 2010 WL 363845, at *10 n. 58 (Del. Ch. Jan. 27, 2010). I use first names in pursuit of clarity and intend no familiarity or disrespect.

[3] Trial Tr. 108:3-109:18. The Talleys became aware of an opportunity to purchase the Property through a friend but lacked sufficient funds or credit to purchase the Property themselves. *Id.* 108:12-23; *id.* 203:7-16.

[4] *Id*. 204:13-205:6.

[5] *Id.* 118:10-119:13; *id.* 167:23-168:7; *id.* 204:6-12. Kenneth testified that the "only understanding" between the parties was the agreement for the Talleys to purchase the Property once they were financially able. *Id.* 409:1-17. Further, Kristina, who attempted to act with Kenneth during the trial, testified that the Talleys are not claiming a life estate in the Property (that was a miscommunication with their attorney) but only that they have the right to purchase the Property. *Id.* 244:3-9.

the Horns was that they promised to sell the Property to the Talleys when they could afford to buy it.[6]

In purchasing the Property, the Horns paid the down payment and took a mortgage out on the Property.[7] At Darren's request, the Talleys paid the monthly mortgage payment of $336.05 for ten years – until 1999, when the Horns paid the mortgage off early.[8] The Talleys did not make similar payments to the Horns after the mortgage was satisfied, but did pay some taxes and insurance on the Property.[9] They also paid the costs for materials and performed work on some improvements and repairs on the Property over the years, although evidence shows that the Horns and others paid for and completed many more projects for the Property.[10]

---

[6] *Id.* 365:15-18; *id.* 366:12-13; *id.* 407:22-408:1; *id.* 409:1-17. *But see id.* 507:17-18 (Janice's testimony that Judith had told the Talleys that they "never would have to move out of [the Property]").

[7] *Id.* 207:13-18;

[8] *Id.* 207:19-24; *id.* 208:8-10; *id.* 406:18-407:21. Judith testified that they used funds from a work bonus for Darren to pay off the mortgage on the Property instead of putting together a college fund for their children. *Id.* 124:14-21; *id.* 125:19-126:9.

[9] *Id.* 126:14-128:11; *id.* 208:23-209:10; *id.* 221:19-222:2.

[10] The testimony shows that Kenneth installed a new roof on the house and a deck, and performed roof repairs, purchasing the shingles, which cost approximately $700.00. *Id.* 129:15-22. Darren testified he offered to reimburse Kenneth for the shingles, but Kenneth said "don't worry about it." *Id.* 211:3-9. Darren testified that he helped build a bathroom in the house, purchased and helped install a furnace (with Kevin), which he paid for, and built sheds on the Property. *Id.* 210:2-8. Robin testified that she paid for the materials to build a deck on one side of the house, which was built by Kenneth. *Id*. 46:16-47:5. Kevin testified he purchased the materials and installed central air in the house, installed new ductwork and hot water heaters at his own expense or with materials given to him, built a

In 1992, the understanding between Darren and the Talleys that they could purchase the Property was reduced to writing in an Agreement of Purchase and Sale ("Agreement").[11] The Agreement provided that the Horns will sell the Property to the Talleys for $47,250.00, with settlement to occur not later than thirty (30) days from the date of the Agreement.[12] It also provided that, at settlement, the Horns would convey the Property to the Talleys in return for a certified or cashier's check for the purchase price.[13] The evidence indicates that the Agreement was never performed.[14] The Property remains titled in Judith and Darren's names.[15] And, the

---

deck and renovated a bathroom in 1989 on the Property. *Id.* 77:19-83:21. Judith testified that she helped with the 1989 bathroom renovation. *Id.* 131:2-11.

[11] Pls.' Tr. Ex. 1. The parties' memories about the circumstances surrounding the Agreement are fuzzy, *see id.* 113:6-115:5; *id.* 206:9-20, and there is ambiguity as to the exact date that the Agreement was executed. *See* Pls.' Tr. Ex. 1. The date of the Agreement was handwritten in as September 8, 1992, which was stricken and replaced with February 19, 1993 (Darren and Judith initialed the change). *Id.* I do not need to resolve this factual issue because the ambiguity as to the date does not alter the legal analysis. There is no evidence disputing the validity of the Agreement. *Id.* 114:16-115:5; *id.* 206:9-20.

[12] "Thirty (30)" is handwritten on the Agreement and initialed by Darren and Judith. Pls.' Tr. Ex. 1, ¶ 4.

[13] *Id.*, ¶¶ 5, 6.

[14] Trial Tr. 116:6-15; *id.* 117:2-6; *id.* 206:21-207:12. Robin testified that, in 1992, to help the Talleys purchase the Property, she paid off some of their debts "so that their credit report would look as good as it could," but when she went to the bank with them, it didn't appear that the Talleys could get a loan for the purchase. *Id.* 45:4-46:5. Kenneth confirmed that he and Robin went to the bank about obtaining a loan to purchase the Property, but stated that he called Judith and "she said no." *Id.* 393:17-20. He also confirmed that they did not qualify for a loan in 1992. *Id.* 395:3-12.

[15] D.I. 1, ¶ 5.

evidence does not show that Kenneth or Janice were ever financially able to purchase the Property or notified the Horns that they were able to purchase the Property.[16]

At the end of 2016, Kenneth left, leaving Janice at the property, and has not lived with her since.[17] Kenneth lived with other children until purchasing a home with Kristina at 28467 Pocahontas Avenue, Millsboro, Delaware ("Millsboro property") in June 2018.[18] In 2019, Janice moved to Luther Village in Dover, Delaware, and has lived there since, except for three months in 2020 when she returned to the Property.[19] After Janice left the Property, Kenneth, Kristina, and Kurt Costello ("Costello"), Kristina's friend, have lived in or otherwise used the Property.[20]

---

[16] Trial Tr. 119:14-20; *id.* 120:3-9. Kenneth testified that there were times, in 1998 and after 2001, he was financially able to purchase the Property, but could not identify specific time frames when he had the funds needed to purchase the Property. Kristina testified that she has knowledge of the Talleys' finances and they had the funds to purchase the Property at the time of trial, but did not recall the amount of funds they had (she also identified the current purchase price of the Property as $47,250.00, the Agreement's price). *Id.* 244:11-246:12.

[17] *Id.* 48:2-51:21; *id.* 136:2-12; *id.* 214:24-215:2; *id.* 381:9-382:12; *id.* 384:18-385:2.

[18] *Id.* 136:14-21; Pls.' Tr. Ex. 9; Defs.' Tr. Ex. 1.

[19] Trial Tr. 147:23-151:16; *id.* 509:20-510:2. Janice testified that she applied to move into Luther Village one and one-half years before she was able to get a space, she moved in around March 2019 and, after returning to the Property during the COVID-19 pandemic, she moved back to Luther Village once she was allowed to do so. *Id.* 508:12-510:3-6. Kristina asserts that Janice was forced to move to Luther Village. *See id.* 348:7-12. Judith denies her claim, *see id.* 151:22-152:22, and Janice testified that Judith asked her to leave but she was not forced to leave. *Id.* 507:6-15; *id.* 510:7-11.

[20] *Id.* 238:7-11; *id.* 254:20-24. Kenneth claims he stays at both the Millsboro property and the Property. *Id.* 376:23-377:3; *but see id.* 143:1-144:22 (Judith's testimony that Kenneth was living in the Millsboro property). Since 2016, the Talleys have continue to pay no rent,

Around August 2019, Kenneth suggested that the Horns sell the Property to Costello.[21] Negotiations between the Horns and Costello ensued but no agreement for Costello to purchase the Property was ever completed.[22] In 2020, the Horns filed a summary possession action against the Talleys, Kristina and Costello in the Justice of the Peace Court, which was dismissed by stipulation on January 11, 2021.[23]

*B. Procedural History*

On January 6, 2021, the Talleys filed a complaint ("Complaint") against the Horns, claiming an equitable life estate in the Property through promissory or equitable estoppel, or a constructive trust.[24] On January 7, 2021, the Talleys filed a lis pendens on the Property in the Sussex County Recorder of Deeds.[25] On February

---

although Kristina testified that she, Costello, and Kenneth recently installed a dishwasher, painted, replaced a toilet, generator, and furnace, and purchased heating oil. *Id.* 243:20-23; *id.* 295:20-296:14.

[21] *Id.* 213:15-214:20; *id.* 223:2-7; *id.* 386:1-13.

[22] *Id.* 213:17-214:20. Negotiations fell apart after an issue arose concerning the Property's cesspool/septic system, which prompted Darren to request a higher selling price to address that issue. *Id.* 214:8-20.

[23] D.I. 6, ¶ 19; The notice of judgment/order states that Kristina and Costello averred that they "are guests of Kenneth Talley and have no possessory claim to the property in dispute." Defs.' Tr. Ex. (this exhibit was improperly labeled "Defendant's Exhibit #3" at trial).

[24] D.I. 1. The Talleys were originally represented by counsel until their counsel withdrew on February 24, 2022, upon receiving notarized statements from the Talleys terminating their attorney-client relationship, and have acted *pro se* since. *See* D.I. 27; D.I. 29.

[25] D.I. 4.

3, 2021, the Horns filed their answer, denying the Talleys' claims and seeking attorneys' fees.[26]

The parties engaged in discovery.[27] The trial was originally scheduled for November 3 and 4, 2021, but was rescheduled to May 3 and 4, 2022.[28] On March 22, 2022, Kenneth filed a letter with the Court, which, among other things, requested a continuance of the trial, which was denied.[29] On April 13, 2022, the Horns filed their portion of the pre-trial stipulation.[30] Also on April 13, 2022, the Talleys filed separate requests for a continuance, citing medical reasons, which I denied but requested additional documentation concerning reasonable accommodations so that the trial could proceed.[31] The Talleys failed to appear at the April 26, 2022 pre-trial conference.[32]

On April 29, 2022, Kenneth filed an interlocutory appeal with the Delaware Supreme Court of my letter orders denying continuances.[33] On April 29, 2022, the

---

[26] D.I. 6.

[27] D.I. 8-18; D.I. 21-22.

[28] D.I. 23. When postponing the trial, I asked whether the parties would agree to mediation but the Horns did not agree. *Id.*; D.I. 24.

[29] D.I. 31. Kenneth requested mandatory mediation and I explained to him that the Court could not order mandatory mediation in this instance. *Id.*; D.I. 33.

[30] D.I. 34.

[31] D.I. 35; D.I. 36; D.I. 37, at 2.

[32] D.I. 39.

[33] D.I. 42.

Supreme Court issued a notice to show cause why the appeal should not be dismissed for lack of subject matter jurisdiction.[34] The Delaware Supreme Court dismissed the appeal for lack of subject matter jurisdiction on May 19, 2022, and denied a motion for reargument on May 31, 2022.[35]

Trial was held in this matter on May 3, 2022 and May 4, 2022.[36] Janice did not appear at trial.[37] At the conclusion of trial, I held the record open for the limited purpose of taking Janice's testimony. Janice's testimony was taken by telephonic hearing on June 10, 2022.[38] Kenneth did not appear at that telephonic hearing.[39] At that time, the record was closed.[40]

## II. ANALYSIS

Pending before me are the Talleys' claims seeking (1) specific performance on the Agreement to grant them the right to purchase the Property, which they argued

---

[34] D.I. 43. Kenneth did not seek leave to file an interlocutory appeal in this Court, and he did not seek a stay of proceedings in either this Court or the Delaware Supreme Court.

[35] D.I. 53.

[36] D.I. 45. At the beginning of trial, I explained that we were proceeding despite the interlocutory appeal because there was no stay from this Court or the Supreme Court regarding the action in this Court. Trial Tr. 24:12-25:11.

[37] D.I. 44.

[38] D.I. 54.

[39] Trial Tr. 495:19-20.

[40] *Id.* 512:11-14.

at trial, and (2) a declaration that they have a life estate in the Property, based on promissory or equitable estoppel, or a constructive trust, from the Complaint.

I exercised great leniency in these proceedings in light of the Talleys' decision to proceed *pro se* and the circumstances of this case, including making procedural adjustments at trial and allowing exhibits and witnesses to be presented that were not part of pre-trial discovery. "Although *pro se* litigants are afforded some leniency in presenting their cases, '[t]here is no different set of rules for *pro se* plaintiffs, and the trial court should not sacrifice the orderly and efficient administration of justice to accommodate the unrepresented plaintiff.'"[41] "The Court recognizes that *pro se* litigants are afforded some leniency when presenting their case. However, all plaintiffs must meet the same substantive requirements. Any leniency must be limited to the extent that it does not affect the substantive rights of the parties."[42] Although the Talleys must still prove their claims, I look upon their arguments and filings with leniency and consider the actual substance of those arguments rather than focusing on technical defects.[43]

In addition, the Horns asked, in their pre-trial stipulation and at trial, that the Court amend the pleadings under Court of Chancery Rule 15(b) to allow issues that

---

[41] *Damiani v. Gill*, 116 A.3d 1243 (Del. 2015) (citing *Draper v. Med. Ctr. of Delaware*, 767 A.2d 796, 799 (Del. 2001).

[42] *Willis v. Bayhealth Surgical Assoc.*, 2020 WL 930066, at *3 (Del. Super. Feb. 26, 2020).

[43] *See, e.g., Sloan v. Segal*, 2008 WL 81513, at *7 (Del. Ch. Jan. 3, 2008).

are tried by express or implied consent by the parties at trial to be treated as if they had been raised in the pleadings.[44]  In the spirit of the leniency with which I allowed this trial to be conducted, I address many of the contentions made by both parties at trial that were not raised in the pleadings.[45]

> A. *The Talleys Have Not Met the Requirements for Obtaining Specific Performance of the Agreement.*

In his closing statement, Kenneth argued that he should be allowed to perform on the Agreement.[46]  A party seeking specific performance of an agreement for the sale of real estate must establish by clear and convincing evidence that he has a valid contract, he is ready, willing and able to perform his obligations under the contract, and that the balance of equities tips in his favor.[47]  He must also prove that he has no

---

[44] D.I. 34, at 9.  The Horns request that the Court declare that the Talleys have no interest in the Property, order the Talleys to vacate the Property by a date certain and cancel the lis pendens recorded on the Property. *Id.*, at 8; Trial Tr. 482:23-484:21.

[45] In addition to the Talleys' contract-related claims, I address the Horns' request for a declaration that the Talleys have no interest in the Property since the granting of such a declaration directly relates to the Talleys' claims, and the Horns' claim seeking cancellation of the lis pendens filed by the Talleys.  (I address that claim under 25 *Del. C.* §1606, which permits the Court, upon motion, to order the cancellation of a lis pendens once the final judgment in the relevant case is entered and the appeal period has expired.)  However, I decline to address the Horns' request that I order the Talleys to vacate the Property by a date certain as part of this action, since that claim was not brought as a counterclaim and exceeds the scope of this matter.

[46] Trial Tr. 401:8-401:10; *id.* 465:15-23.

[47] *Pulieri v. Boardwalk Properties, LLC*, 2015 WL 691449, at *5 (Del. Ch. Feb. 18, 2015) (citing Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1158 (Del. 2010)); Walton v. Beale, 2006 WL 265489, at *3 (Del. Ch. Jan. 30, 2006).

adequate legal remedy.[48]   Specific performance is an "extraordinary remedy" available at the discretion of the court.[49]

First, I consider whether Kenneth has proven that the Agreement is a valid contract.  "Courts have found the essential terms of a real estate contract to be the price, date of settlement, and the property to be sold."[50]  The Agreement contains the essential terms – the property was identified, the price was listed as $47,250.00, and the settlement date was 30 days after the date of the Agreement.[51]  I conclude that the Talleys have shown that Agreement was a valid contract.[52]

---

[48] *Osborn*, 991 A.2d at 1158; *Pulieri*, 2015 WL 691449, at *5

[49] *Pulieri*, 2015 WL 691449, at *6 (citations omitted); *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *12–13 (Del. Ch. Nov. 2, 2007), *aff'd,* 985 A.2d 391 (Del. 2009), *as corrected* (Nov. 30, 2009).

[50] *Walton v. Beale*, 2006 WL 265489, at *5 (Del. Ch. Jan. 30, 2006), *aff'd,* 913 A.2d 569 (Del. 2006); *Pulieri*, 2015 WL 691449, at *6 ("the material conditions to a party's obligation to perform also are essential terms of an enforceable contract").

[51] It appears the Agreement date was changed from September 8, 1992 to February 19, 1993. *See supra* note 11.  For purposes of this decision, I assume without deciding that the later date – February 19, 1993 – is the Agreement date.  In addition, the Talleys appear to allege an oral understanding between the parties occurred in 1989 when Darren promised them that they could buy the Property in the future for fair market value. *See supra* note 4 and accompanying text.  "The parol evidence rule functions to preclude the admission of antecedent understandings and negotiations for the purpose of 'varying or contradicting' the express terms of a fully integrated contract." *Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*,  2010 WL 1838608, at *10 (Del. Ch. Apr. 28, 2010) (citations omitted). The Agreement is a fully integrated sales contract for the Property, so any variations in terms from the prior, antecedent understandings between the parties, such as the 1989 alleged oral understanding, cannot be relied upon.

[52] At trial, Kenneth contended that he was fraudulently induced into making the Agreement because the Horns knew that he would not be able to close on the Property within 30 days at the time they entered into the Agreement and they should have let him have the Property after that. Trial Tr. 363:9-23.  Although not addressed in the Complaint, for purposes of

Next, I consider whether the Talleys were ready, willing and able to perform their obligations under the Agreement. The Talleys have not shown, by clear and convincing evidence, that they were ready, willing and able to close on the Property consistent with the Agreement's settlement date – 30 days after February 19, 1993.[53] "It is fundamental law that a party seeking a decree for specific performance of a contract must, himself, have performed within the time specified [for] his own obligations under the contract."[54] Memories concerning the Agreement are fuzzy,[55]

completeness, I address this contention. "A claim of negligent misrepresentation, or equitable fraud, requires proof of all of the elements of common law fraud except that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015) (internal quotation marks and citations omitted). The party claiming equitable fraud needs to show either a special relationship between the parties such as a fiduciary relationship, or other justification for an equitable remedy. *Zebroski v. Progressive Direct Ins. Co.,* 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014). The elements of common law fraud are: (1) a false representation of fact by the Horns, which the Horns knew or believed to be false or acted with reckless indifference as to its truth or falsity; the Horns intended to induce the Talleys to rely on the representation, and the Talleys actually and justifiably relied on the false representation, incurring damages as a result. *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *3 (Del. Ch. Dec. 19, 2002), *aff'd,* 825 A.2d 239 (Del. 2003). Here, there was no evidence presented to show that the Horns made a false representation of fact to the Talleys intending to induce them to enter into the Agreement, or that the Talleys relied on a representation by the Horns in entering into the Agreement, or that they suffered damages as a result. *See supra* note 11. It is Kenneth – not the Horns – who would have known, when he signed the Agreement, whether or not he would be able to close on the Property within 30 days. There is no evidence of fraud in this instance.

[53] *See supra* note 51.

[54] *Twin Willows, LLC v. Pritzkur, Tr. for Gibbs*, 2022 WL 3039775, at *8 (Del. Ch. Aug. 2, 2022), *adopted* (Del. Ch. 2022) (citing *Wells v. Lee Builders, Inc*., 99 A.2d 620, 621 (Del. 1953) (citations omitted)).

[55] Trial Tr. 113:6-115:5; *id.* 206:9-20.

and although Kenneth alleges that the Horns breached the Agreement by refusing to sell the Property to him, I find the evidence does not support his assertion, considering the Horns' testimony and the lack of evidence that the Talleys had sufficient funds to purchase the Property, or tendered the purchase price, at the settlement date.[56]  When the settlement date passed without the exchange of the purchase price for the Property, the Agreement expired of its own terms.[57]

Finally, I consider whether the equities favor specific performance of the Agreement.  "In some circumstances, when specific enforcement of a validly formed contact would cause even greater harm than it would prevent, courts of equity will decline a petition for specific enforcement.  Thus, the remedy of specific performance is limited to instances where special equities call for it."[58]  In this case, the equities favor the Horns.  The Horns' contributions to the Property far exceed

---

[56] *Id.* 117:13-18; *id.* 206:5-8.  The evidence shows that the Talleys' attempt to obtain a loan to purchase the Property around the time of the Agreement was unsuccessful. *See supra* note 14.  Further, it does not appear that they have had the necessary funds to close the transaction at any time. *See supra* note 16 and accompanying text.

[57] *See supra* notes 12-14 and accompanying text.  Although Darren indicated that he and Judith were open to selling the Property to the Talleys after 1993, *see* Trial Tr. 444:12-19, there is no evidence that the parties entered in another contract concerning sale of the Property after the Agreement.  There were negotiations in 2019 and/or 2020 between Costello and Darren concerning the sale of the Property. *See supra* note 22 and accompanying text.  However, Costello and Kristina are not parties to this action and there is not sufficient evidence to show that the negotiations resulted in an agreement to sell the Property. *Id.*

[58] *Walton v. Beale*, 2006 WL 265489, at *7 (Del. Ch. Jan. 30, 2006), *aff'd,* 913 A.2d 569 (Del. 2006).

the contributions of the Talleys, who benefitted by enjoying the use of the Property for 33 years.[59] Considering the evidence as a whole, I find that the Talleys have not proven, by clear and convincing evidence, their claim for specific performance of the Agreement.

> B. *The Talleys Have Not Proven They Have a Life Estate or Other Interest in the Property.*

In the Complaint, the Talleys seek a declaration that they have an equitable life estate in the Property, based on promissory or equitable estoppel, or a constructive trust, from the Complaint.[60] The Talleys base their claim on their allegation that the Horns told the Talleys that "they would hold onto the title but that Mr. and Mrs. Talley would be able to live in the Property for as long as they wanted."[61]

---

[59] The Talleys paid monthly mortgage payments of $336.05 for ten years, and for some improvements and repairs on the Property, while living on the Property without paying rent. *See supra* notes 8-10. The Horns paid off the mortgage on the Property in 1999, also paid taxes, insurance and for improvements and repairs on the Property. *Id.*

[60] D.I. 1.

[61] *Id.*, ¶ 9. Although the Talleys claim a life estate, I find it questionable whether what was allegedly promised to them was a life estate. "A life estate is a recognized property interest." *William H.L. v. Virginia L.L.*, 457 A.2d 327, 330 (Del. 1983). It "is created by language demonstrating an intent to grant the right to possess, use, and enjoy the property during life." 31 C.J.S. Estates §38. "Abandonment is not usually a method by which a life estate may be extinguished." *In re Holden*, 2010 WL 1820180, at *2 (Del. Ch. Apr. 21, 2010). Here, the Talleys were allegedly promised that they could live on the Property for as long as they wished. Unlike a life estate, the promise did not grant any right beyond living on the Property so that, once they no longer lived on the Property, any claimed right they had to the Property ceased. As discussed below, I find, instead, that the Talleys have

For their promissory estoppel claim, the Talleys argue that they reasonably relied on the Horns' promise that they could live in the Property indefinitely, were induced to make the Property their home, pay towards the mortgage, insurance and taxes, and make improvements on the Property at their own expense and not to purchase the Property, and it would be unjust to force Kenneth "out of his home at the advanced age of 84 years."[62] The Horns respond that they never promised that the Talleys could live on the Property for as long as they wished and that both Kenneth and Janice vacated the Property before this action was filed.[63]

"To establish a claim for promissory estoppel, a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[64] "Promissory estoppel requires a real promise, not just mere expressions of expectation, opinion, or assumption."[65]

---

no interest in the Property – only a revocable oral license terminable at will by the Horns. *See infra* note 83 and accompanying text.

[62] D.I. 1, ¶¶ 21-26.

[63] D.I. 6, ¶¶ 21-26.

[64] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).

[65] *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del. Ch. Mar. 18, 2009).

This claim fails because the Talleys have not proven, by clear and convincing evidence, that the Horns promised them a life estate or to live on the Property for as long as they wished. The Horns deny that they made any such promises and Kenneth, at trial, testified that the only understanding he had with the Horns was their promise to sell the Property to him and Janice when they could afford to buy it.[66] So, there can be no reasonable reliance on a non-existent promise. Further, there is no proof that the alleged action taken by the Talleys to their detriment – to not purchase the Property – resulted from that promise, since the Talleys contracted to purchase the Property in the Agreement and it has not been shown that the Talleys were ever able financially to purchase the Property.[67] Indeed, the Talleys have been able to live on and use the Property for over 30 years, in return for making contributions that represented an amount far less than the rental value.[68] Therefore, I find that the Talleys have not proven they have an interest in the Property under promissory estoppel.

The Talleys also claim equitable estoppel applies in this case.[69] Similar to their promissory estoppel claim, the Talleys argue that they relied on the Horns' conduct and verbal representations to make the Property their home, incurred

---

[66] *See supra* notes 5, 6 and accompanying text.

[67] *See supra* notes 11-14, 16 and accompanying text.

[68] *See infra* note 75 and accompanying text.

[69] D.I. 1, ¶¶ 29-32.

expenses on maintenance and improvements, and that it would be unjust to force Kenneth out of the Property and to keep Janice from returning to the Property if she wished.[70] The Horns deny this claim or that they ever demanded that the Talleys leave the Property.[71]

"[E]quitable estoppel is invoked 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.'"[72] To prevail on an equitable estoppel claim, a plaintiff must show, by clear and convincing evidence, that "(i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance."[73] "[T]he standards for establishing the elements of equitable estoppel are stringent; the doctrine is applied cautiously and only to prevent manifest injustice."[74]

The equitable estoppel claim also fails because the Talleys have not proven, by clear and convincing evidence, that the Horns' conduct, and their reliance on that

---

[70] *Id.*

[71] D.I. 6, ¶¶ 29-32.

[72] *Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, 2019 WL 1223026, at \*23 (Del. Ch. Mar. 14, 2019) (citations omitted).

[73] *Id.* (citation omitted).

[74] *Hyetts Corner, LLC v. New Castle Cty.*, 2021 WL 4166703, at \*10 (Del. Ch. Sept. 14, 2021) (internal quotation marks and citations omitted)

conduct, has caused a detrimental change in their position. They have lived on and used the Property for over 30 years, and their contributions towards the Property, including payments towards the mortgage, taxes and insurance, and expenditures for improvements and repairs on the Property, did not represent the lost value to the Horns (if they had rented the Property) during that time.[75] Instead, as a result of their efforts to assist the Talleys in a time of need, the Horns' position has changed to their detriment. Therefore, I deny the Talleys' claim for an equitable life estate based upon equitable estoppel.

Finally, the Talleys seek the imposition of a constructive trust in the nature of a life estate in their favor, arguing that the Horns have been unjustly enriched.[76] They point to their confidential familial relationship with the Horns, and assert that the Horns have engaged in unfair and unconscionable conduct by benefitting from the Talleys' contributions, including for the mortgage and improvements, and then demanding that the Talleys leave the Property for no good cause despite their alleged promise that the Talleys could remain on the Property for as long as they wished.[77]

---

[75] Trial Tr. 209:11-18 (Darren's testimony that, extrapolating the $336.05 monthly payment to current rent values of about $1,600.00, he estimates the Horns sacrificed approximately $205,000.00 in lost rent).

[76] D.I. 1, ¶¶ 35-40.

[77] *Id.*, ¶¶ 36-38.

The Horns admit they have a confidential familial relationship with the Talleys, but deny their actions have been unfair or unconscionable.[78]

"A constructive trust is an "implied" trust that a court imposes over property when a defendant's fraudulent, unfair, or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty."[79] Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[80] "To prevail on [an] unjust enrichment claim, [plaintiffs] must prove the following elements by a preponderance of the evidence: (1) an enrichment [conferred by the plaintiffs on the defendants], (2) an impoverishment [of the plaintiffs], (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[81]

Their equitable estoppel claim fails because the evidence does not show fraudulent, unfair or unconscionable conduct by the Horns or that the Horns have

---

[78] D.I. 6, ¶¶ 35-40.

[79] *Mercer v. Mercer*, 228 A.3d 410 (Del. 2020) (citing *Adams v. Jankouskas*, 452 A.2d 148, 151-52 (Del. 1982).

[80] *In re Tr. FBO duPont Under Tr. Agreement Dated Aug. 4, 1936*, 2018 WL 4610766, at *13 n. 97 (Del. Ch. Sept. 25, 2018) (citation omitted).

[81] *Schaeffer v. Lockwood*, 2021 WL 5579050, at *20 (Del. Ch. Nov. 30, 2021), *judgment entered* (Del. Ch. 2022).

been unjustly enriched – whatever benefit they received by allowing the Talleys to reside on the Property (or enrichment) was offset by their loss in rental value or other means of making the Property productive. And, any loss to the Talleys through payments they made towards the mortgage, improvements, etc., (or impoverishment) was not unfair or unjustified because they were allowed to live on the Property, since at least 1999, without paying any kind of rent.

In summary, although I appreciate Kenneth's desire for home ownership,[82] the Talleys have not proven they have a life estate, or any equitable interest, in the Property. I find that the Talleys have no interest in the Property. At most, they have a permissive oral license to use the Property.[83] "A license amounts to a permissive use granted by the owner of a property to another which is terminable at the will of the owner."[84] "[It] does not confer upon the licensee any title, interest, or estate in such property."[85] The Horns can revoke the Talleys' license to reside at and use the Property at any time. Further, it appears that Kenneth has invited Kristina and Costello as his guests on the Property and, as Kenneth's guests, they are subject to the Talleys' license to use the Property.

---

[82] Trial Tr. 465:24.

[83] *See Timmons v. Cropper*, 172 A.2d 757 (Del. Ch. 1961).

[84] *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013) (citation omitted).

[85] *Carriage Realty P'ship v. All-Tech Auto., Inc.*, 2001 WL 1526301, at *8 (Del. Ch. Nov. 27, 2001).

*C. Attorneys' fees are not awarded in this case.*

Both parties requested attorneys fees in their pleadings.[86] Kenneth did not renew his request for attorneys' fees at trial. The Horns argue that they should be awarded attorneys' fees under the bad faith exception to the American Rule.[87] "Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[88] A well-recognized equitable exception to the American Rule, which applies only in "extraordinary cases," is where the "losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[89] Courts have "found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[90] To find bad faith, a party must have acted in subjective bad faith, which "involves a higher or more stringent standard of proof, *i.e.,* 'clear evidence.'"[91] Based on the record before me, I find that the high standard for finding

---

[86] D.I. 1, at 12; D.I. 6, at 35.

[87] Trial Tr. 484:22-486:21.

[88] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citation omitted); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014).

[89] *Brice v. State, Dep't of Correction*, 704 A.2d 1176, 1179 (Del. 1998) (citations omitted).

[90] *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)) (internal quotation marks omitted); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

[91] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997), *aff'd,* 720 A.2d 542 (Del. 1998) (citations omitted).

bad faith has not been met here.  The delay in this matter largely resulted from the Court's own continuance of this matter.[92]  And, there is insufficient proof that the Talleys have intentionally engaged in delay tactics[93] or have knowingly asserted frivolous contentions.[94]  Accordingly, I recommend that the Court decline to shift attorneys' fees in this matter.

## III.  CONCLUSION

For the reasons set forth above, I recommend that the Court enter judgment in favor of Defendants Darren Horn and Judith Horn, and deny Plaintiffs Kenneth Talley and Janice Talley's claims.  I also recommend that the Court declare that the Talleys have no interest in the Property, enter an order cancelling the lis pendens on the Property consistent with 25 *Del. C.* §1606, and decline to shift fees in this case.  This is a final master's report and exceptions may be taken under Court of Chancery Rule 144.  The stays of exceptions on my letter orders dated March 22, 2022, April 13, 2022, and April 26, 2022 are lifted, and exceptions to those may be taken under Rule 144.  Plaintiffs' counsel shall submit a proposed order implementing this decision within 15 days after this report becoming final.

---

[92] D.I. 23.

[93] *See* D.I. 35-36, Ex.

[94] The Horns argue that the Complaint was vastly overstated. Trial Tr. 485:2-7.  Indeed, the evidence may suggest that the Complaint's averments were misleading, but, that alone is not enough, in my opinion, to justify fee shifting in this instance.